RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0175p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

CATRENA GREEN,

          *Plaintiff-Appellant,*

    *v.*

ADAM THROCKMORTON,

          *Defendant-Appellee.*

No. 10-4487

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:09-cv-995—Norah McCann King, Magistrate Judge.

Decided and Filed: June 13, 2012

Before: COLE, GILMAN, and WHITE, Circuit Judges.

_____

## COUNSEL

_____

**ON BRIEF:** Stephen R. Felson, Cincinnati, Ohio, for Appellant. Bridget C. Coontz, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

_____

## OPINION

_____

RONALD LEE GILMAN, Circuit Judge. Following an evening traffic stop in Chillicothe, Ohio for failing to dim her high beams in the face of oncoming traffic, Catrena Green was arrested for driving under the influence of drugs or alcohol. The arrest was based on Green's responses to a series of field sobriety tests administered by State Highway Patrol Trooper Adam Throckmorton. But when a more definitive test—Green's urine sample—later came back clean, all charges against her were dropped.

1

Green subsequently brought suit under 42 U.S.C. § 1983 against Trooper Throckmorton, alleging that he had violated her Fourth Amendment rights by (1) conducting the field sobriety tests without having a reasonable suspicion that she was impaired, and (2) arresting her without probable cause. The district court granted summary judgment in favor of Throckmorton on both counts and dismissed the case. Green has appealed. For the reasons set forth below, we **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

## I.  BACKGROUND

Green lives in Goose Point, South Carolina. On a Sunday in August 2008, she drove approximately 600 miles from her home in South Carolina to a popular motorcycle event taking place at the Ross County fairgrounds in Chillicothe, Ohio. She arrived at the fairgrounds around 8:30 p.m., leaving a couple of hours later to pick up food at a nearby Walmart. The roads at the time were wet from a recent rain, making visibility somewhat worse than normal. Green turned on her high beams while driving to help her see better.

Traveling in the opposite direction was Trooper Throckmorton. Throckmorton saw that Green was violating an Ohio traffic law by failing to dim her high beams as she approached oncoming traffic, *see* Ohio Rev. Code Ann. § 4513.15, so he made a U-turn and began trailing Green. His in-car video camera recorded the events that followed.

As shown by the video, Green briefly crossed over a shoulder lane marker while turning onto an exit ramp. Throckmorton then signaled Green to stop by activating his lights. Green pulled over immediately. After exiting his patrol car, Throckmorton asked Green for her license and registration. She asked what she had done wrong, to which Throckmorton replied: "I'm trying to figure out why you picked me of all people to bright coming down the highway there. You brighted me as you were coming down the highway." Green responded by stating, "Oh, because I can't see." She explained that the reason she could not see was because of the wet road conditions. Green then asked

if she had done anything else wrong, and Throckmorton said, "No, not really. You just brighted me and blinded me." He did not mention the brief lane violation.

Around this time, Throckmorton momentarily pointed his flashlight inside Green's vehicle. Throckmorton stated in his deposition testimony that he aimed the flashlight's beam toward the floor of the vehicle so as to illuminate Green's face without shining the light directly into her eyes. He "noticed that her pupils were constricted," which he thought "was kind of abnormal" because his training had taught him that a person's pupils will typically dilate in a dark setting. But, as he noted during his deposition, "different chemicals or different types of drugs [can] hamper this process. So. . . if you shine a light into somebody's eyes, their pupils may stay completely dilated, they won't react to the light. Or else . . . they may be constricted, and you put them in a low lighting and they won't dilate."

In response to a question about where she was coming from, Green answered that she had just left the fairgrounds and was heading to Walmart. She told Throckmorton that her license was inside her purse in the trunk of her sport utility vehicle (SUV). Throckmorton allowed Green to exit the vehicle in order to retrieve her license. But before she did so, Green apologized for activating her high beams and explained: "It's so dark, and it's no streetlights like we have in South Carolina. And I was trying to see and be careful." Green apologized once again and then opened her driver's side door to get her license from the trunk.

As she stepped out of the SUV, Green either forgot to completely remove her seatbelt or became entangled in it. She must have already unfastened the seatbelt, however, because her foot touched the outside pavement before Throckmorton commented that she "might want to take [her] seatbelt off." Green was able to remove her seatbelt quickly and easily.

Throckmorton followed Green to the back of her vehicle, where she opened the trunk. Being an SUV, the trunk was not a separately enclosed compartment, but instead part of the vehicle's interior. Throckmorton used his flashlight to look into the SUV and could see that it was full of various items—presumably camping equipment and other

materials for Green's road trip.  He did not notice anything suspicious.  Nor did Throckmorton see or smell alcohol or drugs at any time during the stop.

Green retrieved her driver's license from her purse and handed it to Throckmorton.  After reviewing the license, he asked whether Green had had anything to drink that evening.  She said, "Nope.  Water."  He also asked whether she had taken any drugs or medication.  She stated that she had not.

Throckmorton then immediately began conducting a series of field sobriety tests.  He began with the horizontal-gaze nystagmus test (HGN test), which involves moving a stimulus from side to side while the subject follows it with her eyes.  The purpose of the test is twofold:  it checks a person's ability to follow directions and also detects nystagmus, "an involuntary jerking of the eye" that is a common indicator of impairment.

Throckmorton instructed Green "to follow the tip of my pen back and forth with your eyes."  He started moving the pen, but Green apparently could not follow it.  Throckmorton repeated the instructions and started over.  He stopped after approximately 20 seconds and again asked Green whether she had taken any drugs or medication.  She again said that she had consumed "just water."

Suspecting otherwise, Throckmorton told Green:  "You've taken something else.  I mean, you're, you're just completely dazed off there for a second."  Green explained that she was tired, and Throckmorton said that she should be able to perform the test regardless.  Throckmorton tried once more to administer the HGN test, but without success.  As a result, he testified that he "was never able to observe whether she had any nystagmus in her eyes or not."  Throckmorton noted in his "impaired driver report" that Green "could not follow pen."  Green does not recall even taking the HGN test.

Throckmorton then tried another way to help determine whether Green was impaired.  He administered what are known as the alphabet and numbers tests.  Throckmorton first instructed Green to recite the alphabet, beginning with the letter "L" and ending with the letter "S."  She did so without difficulty.  Throckmorton next asked

Green to count backward from 57 to 42.  She was able to do this too, although she hesitated slightly between a few of the numbers.  Throckmorton also "noticed that she talked slowly" and that "[t]here was a slight slur to her words."  But the video's sound recording does not indicate that Green's speech was either unusually slow or slurred.

The next sobriety test was the one-leg-stand test, which requires a person to stand on one leg while counting up from the number one.  This test usually lasts for a period of 30 seconds and is known as a "divided attention skills test" because it ascertains whether the subject can maintain balance while following instructions.  According to Throckmorton, Green "was able to count in sequential order" during the test, but "[s]he was off balance, she was unstable on her feet, and she kept setting her foot down for balance."  Throckmorton "documented that [Green] set her foot down nine times."  His report also indicated that she hopped, raised her arms for balance, and swayed.

The video basically corroborates this description.  Green was given the instructions, acknowledged that she understood them, and then raised her foot and began counting.  She struggled to maintain her balance throughout the test but did not sway badly.  Her foot appears to have touched the ground on multiple occasions, and she skipped the number 19 while counting.

The final field sobriety test that Throckmorton administered was the walk-and-turn test.  In his deposition testimony, Throckmorton described this test as follows:

> I instruct Ms. Green to stand with her arms down to her side, place her right foot in front of her left, heel to toe, and just hold that position while I finish the instructions.
> I instruct Ms. Green to walk as straight as practical, walking heel to toe, counting each step out loud, keeping her arms down at her side. I instruct her to take nine steps down. I instruct her to stop, leave her left foot planted, turn around 180 degrees with her right foot, taking small steps.
> And I demonstrate all this for her, as well.
> I instruct her to turn around 180 degrees and then do the same thing coming back, keep her arms down at her side, touch heel to toe, and counting steps out loud for a series of nine steps.

The video does not clearly depict Green's performance on this test. It reveals that she swayed very slightly as she walked, used her arms for balance, and turned right instead of left. But because Green's feet are not shown, the video does not indicate whether she "move[d her] feet to keep balance while listening to instructions" or failed to "touch heel to toe," as noted in Throckmorton's report.

After the walk-and-turn test, Throckmorton tried one last time to examine Green's eyes using the HGN test. Again he was unsuccessful. Throckmorton told her, "You're still not following my pen. What are you on, ma'am?" Green said that she was on "nothing." Throckmorton then placed her under arrest for driving under the influence of alcohol or drugs.

While Green was seated in the back of Throckmorton's patrol car, Throckmorton and several other troopers who had just arrived on the scene searched Green's SUV and found no evidence of drugs or alcohol. A dog sniffed the SUV as well and did not alert. Green was then taken to the local jail for booking and testing. She ended up spending over two days in jail before she found a bail bondsman who would take her credit card. When her urine test later came back negative for both alcohol and drugs, all charges against her were dismissed.

Green filed the instant action in November 2009. She alleged that Throckmorton had violated her constitutional rights by (1) conducting field sobriety tests without having a reasonable suspicion that she was impaired, and (2) arresting her without probable cause. The case was referred to a magistrate judge for disposition by consent of the parties.

Following discovery, Throckmorton moved for summary judgment on both claims. He argued that he had not violated Green's constitutional rights during the stop and that, even if he had, he is nevertheless entitled to qualified immunity. The district court, after concluding that no constitutional violations had occurred, granted summary judgment in favor of Throckmorton. This appeal followed.

## II.  ANALYSIS

### A.      Standard of review

We review a district court's grant of summary judgment de novo.  *Huckaby v. Priest*, 636 F.3d 211, 216 (6th Cir. 2011).  Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  But where, as here, there is "a videotape capturing the events in question," the court must "view[] the facts in the light depicted by the videotape."  *Scott v. Harris*, 550 U.S. 372, 378-81 (2007).  The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B.      Green's § 1983 claims

Green's claims are predicated upon 42 U.S.C. § 1983, which provides for the vindication of federal rights.  "To prevail on a § 1983 claim, a plaintiff must establish that a person acting under color of state law deprived the plaintiff of a right secured by the Constitution or laws of the United States."  *Waters v. City of Morristown, Tenn.*, 242 F.3d 353, 358-59 (6th Cir. 2001).

Green asserts that Throckmorton—unquestionably "a person acting under color of state law" during the traffic stop—violated her constitutional rights twice:  first by detaining her for field sobriety tests without having a reasonable suspicion that she was impaired, and then again by arresting her based on the results of those tests, which she contends did not supply the necessary probable cause.  Both claims were dismissed by the district court on the ground that no constitutional violation occurred.  Each will now be addressed in turn.

### 1.      *Green's detention for field sobriety tests*

Green's first claim is based on her detention for field sobriety tests, which came after she had been stopped for failing to dim her high beams in the face of oncoming traffic. The lawfulness of the initial stop is not in question. An officer may stop and detain a motorist without contravening the Fourth Amendment's prohibition against unreasonable searches and seizures "so long as the officer has probable cause to believe that the motorist has violated a traffic law." *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009). Throckmorton clearly had such probable cause here because Green admits that she failed to dim her high beams in the face of oncoming traffic, and the failure to do so is a violation of an Ohio traffic law. *See* Ohio Rev. Code Ann. § 4513.15.

But probable cause to detain a motorist for one violation of the law does not ordinarily provide probable cause to detain the motorist for another violation. Thus, "[o]nce a stop begins, . . . detaining the motorist any longer than is reasonably necessary to issue the traffic citation requires reasonable suspicion that the individual has engaged in more extensive criminal conduct." *United States v. Smith*, 601 F.3d 530, 542 (6th Cir. 2010) (internal quotation marks omitted). Throckmorton concedes that detaining an individual for field sobriety tests is not reasonably necessary to issue a citation for the failure to dim one's high beams. But he argues that he had a reasonable basis for suspecting that Green had committed the crime of driving while impaired.

### a.      *Reasonable suspicion*

Although less demanding than the probable-cause standard, the reasonable-suspicion standard still "requires more than a mere hunch." *United States v. Campbell*, 549 F.3d 364, 370 (6th Cir. 2008) (internal quotation marks omitted). It "requires specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the continued detention of a motorist after a traffic stop." *United States v. Ellis*, 497 F.3d 606, 612-13 (6th Cir. 2007) (internal quotation marks omitted). In conducting a reasonable-suspicion analysis, "[r]eviewing courts must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing," while bearing in

mind that officers are permitted "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them." *Id.* at 613 (internal quotation marks omitted). This totality-of-the-circumstances inquiry requires courts to "determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately." *United States v. Perez*, 440 F.3d 363, 371 (6th Cir. 2006) (internal quotation marks omitted).

The district court in this case reviewed the totality of the circumstances and concluded that Throckmorton had a particular and objective basis for suspecting that Green had been driving while impaired. This conclusion was based on a variety of factors, including Throckmorton's claims that

> (1) [Green]'s pupils were constricted even though it was dark outside; (2) she appeared to be confused; (3) her reactions were slow; (4) she had activated her high beams; (5) she crossed over the white fog line on the side of the road; and (6) she was unsteady on her feet.

*Green v. Throckmorton*, No. 2:09-CV-995, 2010 WL 4279191, at *7 (S.D. Ohio Oct. 22, 2010) (unpublished opinion).

The district court analyzed each factor individually. As to the first, Throckmorton testified that Green's pupils were constricted despite the darkness and that, based on his specialized training, he knew that such constriction can be a sign of impairment. The court considered this testimony to be undisputed because Green could not prove otherwise. As a result, the court was "persuaded that the constriction of [Green]'s pupils was one of the factors creating a basis for reasonable suspicion." *Id.*

Turning to the second factor—Green's apparent confusion—the district court reasoned that this too contributed to a reasonable suspicion that Green was driving while impaired. Video evidence shows that Throckmorton had to remind Green to completely remove her seatbelt before stepping out of the SUV. And Green "conceded in her deposition that being tired could have made it more difficult for her to understand what

was going on when she was pulled over by [Throckmorton]." *Id.* at *8. The court found that this concession also supported the third factor (her slow reactions).

Regarding the fourth and fifth factors—the traffic violations—the district court determined that they were uncontroverted and relevant to the totality-of-the-circumstances analysis because Throckmorton was "entitled to rely on his own training and experience as well as factors that are consistent with innocent behavior in forming a reasonable suspicion." *Id.* at *9. The district court concluded that the traffic violations fell under this description.

Only the sixth factor (being unsteady on her feet) was not credited by the district court as helping to form a basis for reasonable suspicion. With respect to that factor, the court simply could not "say one way or the other whether [Green] was unstable on her feet while exiting her vehicle" because the video was inconclusive. *Id.* at *10. But the court concluded that, even without this factor, the totality of the circumstances justified Throckmorton's decision to administer the field sobriety tests. The court reached this conclusion despite the fact that Throckmorton "did not smell or see alcohol or drugs on her person or vehicle," a fact that the court found relevant but insufficient to tilt the balance of factors against reasonable suspicion. *Id.* "Under these facts," the court held, Throckmorton "had a reasonable suspicion that [Green] was engaged in criminal activity, *i.e.*, driving while impaired, and was therefore justified in further detaining her in order to administer sobriety tests." *Id.*

Green argues on appeal that the district court erred by deciding this question as a matter of law rather than submitting it to a jury. Her argument relies primarily on the analogous case of *Miller v. Sanilac County*, 606 F.3d 240 (6th Cir. 2010), which the district court did not cite. The plaintiff in *Miller* was stopped around midnight by a police officer for driving through a stop sign on an icy road. During the stop, which was not recorded on video, the officer detected what he claimed was "a slight odor of alcohol coming from Miller's breath." *Id.* at 245 (brackets and internal quotation marks omitted). The officer then learned that Miller had a prior drunk-driving arrest on his record and ordered him to perform a series of field sobriety tests. According to the

officer, Miller's eyes appeared "glazed or glassy," although the officer admitted that Miller did not stagger or stumble as he walked. *Id.* The officer proceeded to administer the sobriety tests and determined that Miller failed all but one. After Miller refused to take a breathalyzer test, he was arrested for driving while impaired and for reckless driving. A later blood test for drugs and alcohol came back negative.

Miller brought suit against the officer under § 1983, alleging, among other things, that the arrest was made without probable cause. He did not, however, challenge the lawfulness of the field sobriety tests. Miller instead denied that he had failed any of the tests and contested whether the officer smelled alcohol on his breath. He also explained that the reason he refused to take the breathalyzer test was because he did not trust the officer. In granting summary judgment for the officer, the district court rejected Miller's arguments.

This court reversed. After reviewing the totality of the circumstances, our colleagues in *Miller* determined that the results of the blood test "cast[ ] doubt on [the arresting officer]'s claims that Miller smelled of alcohol and failed the field sobriety tests." *Id.* at 248. The court reasoned:

> Although [the officer's] claims, if believed, would constitute probable cause to arrest for driving under the influence of alcohol, a jury could reasonably conclude, in light of the 0.00% blood alcohol result and Miller's testimony, that [the officer] was being untruthful generally about his observations and did not have probable cause to believe Miller was drinking. In light of the conflict in the evidence, the jury could conclude that [the officer] was lying."

*Id.* at 249.

Green contends that the same is true in the present case. Just as the result of the blood-alcohol test in *Miller* called into question the credibility of the officer in that case, Green claims that the result of the urine test in her case "casts doubt on Trooper Throckmorton's claim that her pupils were constricted." And just as *Miller*'s probable-cause inquiry turned on the credibility of the officer, Green argues that the reasonable-

suspicion inquiry here turns on Throckmorton's credibility. She therefore contends that the question should go to the jury.

We find her argument persuasive. Having carefully "viewed the facts in the light depicted by the videotape," *Scott v. Harris*, 550 U.S. 372, 381 (2007), we cannot say as a matter of law that Throckmorton had a reasonable suspicion, prior to administering the field sobriety tests, to believe that Green was under the influence of drugs or alcohol. Yes, he testified that her pupils were constricted and that this feature suggested possible impairment. But the video provides no evidence to support his claim that Green's pupils were constricted at the time of the traffic stop. And we cannot, consistent with *Miller*, take such testimony on faith. Nor can we penalize Green for failing to produce any evidence directly rebutting Throckmorton's stated observation. After all, Green cannot speak to the appearance of her pupils any more than Miller could speak to the odor of his own breath (or to whether his eyes were "glazed or glassy"). What matters here, rather, is what mattered in *Miller*: that a subsequent test for drugs and alcohol showed that the driver was in fact sober. That evidence alone is sufficient to cast doubt on the truthfulness of Throckmorton's testimony regarding Green's pupils.

Throckmorton nevertheless attempts to distinguish *Miller*. By discussing *Miller* only in the section of his brief arguing that he had probable cause to arrest Green, Throckmorton implies that the case, which involved a probable-cause determination, has no application in the reasonable-suspicion context. But Throckmorton offers no reason why this is so, and none is apparent to us. To the contrary, *Miller*'s rationale—that an officer's unsupported and contested observations regarding a driver's signs of impairment are called into question when a subsequent blood or urine test shows that the driver was not actually impaired—applies with as much force to a detention governed by the reasonable-suspicion standard as to one governed by the probable-cause standard. In both cases, when considering such clear exculpatory evidence, "the jury could conclude that [the officer] was lying." *See Miller*, 606 F.3d at 249. The only difference at the summary-judgment stage concerns the standard of proof that the *additional* evidence, when viewed in the light most favorable to the nonmoving party, must meet

in order to justify the detention.  We therefore decline to limit *Miller*'s reasoning to probable-cause determinations.

Throckmorton also points out that there was no video in *Miller*, and that is indeed a difference.  But stating a difference is not the same as explaining why it matters.  Here, the video sheds no light on the question of whether Green's pupils were constricted.  And it reveals no additional information, as we are about to discuss, that would allow us to conclude as a matter of law that Throckmorton had a reasonable suspicion to detain Green for field sobriety tests.

Because we decline to consider Green's potentially constricted pupils as a factor justifying the grant of summary judgment for Throckmorton, we must look to the other factors identified by the district court:  Throckmorton's somewhat vague claims of Green's confusion and her slow reaction times, plus the two traffic violations.  These factors, when taken together, might be enough to give rise to a "hunch" that Green was impaired, but whether they are the kind of "specific and articulable facts" necessary to "reasonably warrant [the] intrusion" on her liberty—the standard for reasonable suspicion under *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)—is a question for the jury.

As for Green's alleged confusion and slowness, we simply do not detect any confirmation of these conditions from the video.  The district court faulted Green for not citing a particular part of the video to show that there was no confusion and for "conced[ing] in her deposition that being tired could have made it more difficult for her to understand what was going on when she was pulled over by defendant." *Green v. Throckmorton*, No. 2:09-CV-995, 2010 WL 4279191, at \*8 (S.D. Ohio Oct. 22, 2010) (unpublished opinion).  But the critical question is whether "specific and articulable facts" supported Green's detention for field sobriety tests, not whether Green could ultimately disprove or explain her alleged confusion.  And a reasonable jury could conclude that the video contains no such facts; that it instead shows that Green responded directly to Throckmorton's questions, that her speech was not slurred, and that she was completely lucid and rational throughout the traffic stop.

As for the traffic violations, they are certainly relevant as part of the totality-of-the-circumstances inquiry, but the ones in question here do not on their own constitute reasonable suspicion of driver impairment. *See, e.g.*, *Amundsen v. Jones*, 533 F.3d 1192, 1199 (10th Cir. 2008) ("[A]n isolated incident of crossing into another lane will not ordinarily create reasonable suspicion of driving while impaired. Nor will weaving within a lane, without more, ordinarily create reasonable suspicion of driving under the influence." (citation omitted)). This is particularly true in the present case because the sky was dark, the roads were wet, Green only momentarily crossed over the white shoulder marker while turning onto an exit ramp, she was unfamiliar with the area, and Throckmorton did not see or smell any drugs or alcohol during the stop. Nor did Throckmorton contend that Green's high-beam violation was an indication of impairment, especially in light of his concession that "generally . . . we give [drivers] a warning for failure to dim." Moreover, Green had a completely rational explanation for using the high beams on the night in question.

Under these circumstances, a reasonable jury could find that Green's conduct did not create a reasonable suspicion that she was driving under the influence. We therefore conclude that the district court erred in determining as a matter of law that Throckmorton's detention of Green for field sobriety tests was not a violation of her Fourth Amendment rights.

### b.        *Qualified immunity*

Having reached this conclusion, we must reverse the district court's grant of summary judgment unless Throckmorton is entitled to such judgment based on the defense of qualified immunity. Qualified immunity is a doctrine that "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). The Supreme Court has made clear that "qualified immunity is an immunity from suit rather than a mere defense to liability." *Id.* at 231 (internal quotation marks omitted). On the other hand, "where the legal question of qualified immunity

turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *McKenna v. Edgell*, 617 F.3d 432, 437 (6th Cir. 2010) (internal quotation marks omitted).

The question of qualified immunity in this case turns upon which version of the facts one accepts. A reasonable jury could find, for example, that Green acted rationally throughout the stop, that her relatively minor traffic violations were not indicative of impairment, and that Throckmorton fabricated the alleged constriction of Green's pupils to create an after-the-fact justification for the detention. On these facts, Throckmorton's conduct would be "plainly incompetent" and thus strip him of qualified immunity. *See Kennedy v. City of Cincinnati*, 595 F.3d 327, 336-38 & n.7 (6th Cir. 2010) (internal quotation marks omitted) (denying qualified immunity at the summary-judgment stage because the reasonableness of the officer's conduct depended on disputed facts to be determined by the jury). The district court's grant of summary judgment on Green's first claim must therefore be reversed.

### 2.        *Green's arrest for driving under the influence of drugs or alcohol*

Green's second claim under § 1983 asserts that Throckmorton did not have probable cause for her arrest. "An officer has probable cause when 'the facts and circumstances known to the officer warrant a prudent man in believing that an offense has been committed.'" *Miller v. Sanilac Cnty.*, 606 F.3d 240, 248 (6th Cir. 2010) (quoting *Henry v. United States*, 361 U.S. 98, 102 (1959)). "In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Parsons v. City of Pontiac*, 533 F.3d 492, 501 (6th Cir. 2008) (internal quotation marks omitted).

But a lack of probable cause is not necessarily fatal to an officer's defense against civil liability for false arrest. Rather, an officer is entitled to qualified immunity under § 1983 "if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent." *Id.* (internal quotation marks omitted).

Throckmorton arrested Green based on her allegedly poor performance on the field sobriety tests.  Specifically, Throckmorton determined that Green (1) could not follow the pen when he attempted to administer the HGN test, (2) performed well on the alphabet test but hesitated twice during the numbers test, and (3) had difficulty maintaining her balance throughout the one-leg-stand and walk-and-turn tests.  These factors led him to conclude that probable cause existed to support his belief that Green was impaired.

Green responds by pointing out completely innocuous conditions that excused her less-than-perfect performance on the tests.  She argues that she was tired from driving all day, had trouble concentrating due to passing traffic and the noise from Throckmorton's radio, and swayed at times during the tests because she was 42 years old at the time and overweight.  Green contends that these exculpatory factors, when considered as part of the totality of the circumstances, negate any probable cause.  She also relies heavily on *Miller*, arguing that it requires that her claim be submitted to a jury.

The principal problem with Green's argument is that "[o]ften, innocent behavior will form the grounds for probable cause."  *See United States v. Wright*, 16 F.3d 1429, 1438 (6th Cir. 1994).  Indeed, whether probable cause for a crime exists is "based on an examination of all facts and circumstances *within an officer's knowledge at the time of an arrest*."  *Crockett v. Cumberland Coll.*, 316 F.3d 571, 580 (6th Cir. 2003) (emphasis in original) (internal quotation marks omitted).  And here, Throckmorton did not know that Green had been driving all day because she did not tell him.  Nor did he know, because he could not have known, that she was actually sober at the time of the arrest.  He knew only what he could observe during the field sobriety tests.

Still, we are ultimately convinced that Green's performance on the tests was sufficiently ambiguous to submit the probable-cause question to the jury.  She completed several of the tests without any apparent difficulty and others with only minor mistakes.  And the video does not show whether she could follow the pen with her eyes when Throckmorton tried to administer the HGN test.  Because reasonable jurors could

interpret the video evidence differently, we conclude that the district court erred in deciding as a matter of law that Throckmorton had probable cause to arrest Green. We further conclude that the question of qualified immunity turns on disputed facts—namely, on Green's ambiguous performance on the field sobriety tests and on whether Throckmorton was being truthful when he claimed that Green could not follow the pen—and thus "the jury, not the judge, must determine liability." *See McKenna v. Edgell*, 617 F.3d 432, 437-38 (6th Cir. 2010) (holding that whether two police officers were entitled to qualified immunity was a question for the jury).

The case of *Jolley v. Harvell*, 254 F. App'x 483 (6th Cir. 2007), upon which Throckmorton relies, does not require a different result. In that case, Jolley was pulled over at 2:23 a.m. because he paused at a stop sign for 30 seconds for no apparent reason. The officer claimed to have smelled marijuana during the stop and proceeded to administer several field sobriety tests, all of which were recorded on video. Jolley performed well on most of the tests, but he failed to complete the one-leg-stand test. He was then placed under arrest for driving while impaired and, after a subsequent test for drugs or alcohol revealed that he was sober during the stop, he brought suit against the arresting officer.

In an opinion that was issued prior to *Miller*, a panel of this court held that the arrest was lawful. The lead opinion reasoned as follows:

> Although there are certainly facts that militate against a finding of probable cause, there are sufficient facts to support the arrest. We would be hard-pressed to conclude that no reasonably prudent officer would have made the same decision, especially when balanced against the potential consequences of an incorrect call had Jolley ultimately proven to be impaired. A drunk driver is a severe threat to the safety of others. Jolley's ultimate innocence is irrelevant.

*Id.* at 489 (citations omitted).

We do not know whether *Jolley* would have been decided differently had *Miller* come before it, and we note that the concurring opinion in *Jolley* was unwilling to join in the reasoning of the lead opinion. But even putting these reservations to one side,

*Jolley* is an unpublished, nonbinding case that can be distinguished on its facts. The arrest in that case took place in the middle of the night, after the driver exhibited unusual driving behavior and failed to complete the one-leg-stand test. Here, in contrast, Green was pulled over for committing two fairly common traffic violations, Throckmorton did not claim to have seen or smelled any drugs or alcohol during the stop, and Green was able to substantially complete all the field sobriety tests given to her except for the HGN test—and her performance on that test cannot be ascertained from the video because her back was facing the camera. These differences, when combined with Green's seemingly rational behavior during the stop, could lead a jury to conclude that there was no probable cause to arrest Green for driving while impaired and that Throckmorton was plainly incompetent in thinking that there was.

We understand, of course, the difficulty inherent in making on-the-fly determinations regarding possible driving impairments, just as we recognize the severity of drunk driving and "the potential consequences of an incorrect call had [Green] ultimately proven to be impaired." *See id.* But this difficulty and these consequences *always* exist when an officer stops someone for a traffic violation. Yet officers do not have free rein to administer field sobriety tests to whomever they please and then to arrest that person for making the slightest misstep while performing the tests. Whether that is what happened in this case is a question for the jury.

### III.  CONCLUSION

For all the reasons set forth above, we **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.