RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0235p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

RYOHEI AKIMA,

>    *Plaintiff-Appellee*,

>    *v.*

>    CAITLYN M. PECA, individually and in her official
capacity as a Public Safety Officer,

>    *Defendant-Appellant*.

No. 22-2058

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:21-cv-10080—David M. Lawson, District Judge.

Decided and Filed:  October 26, 2023

Before:  MOORE, GIBBONS, and STRANCH, Circuit Judges.

_____

### COUNSEL

**ON BRIEF:**  Kali May Lester Henderson, T. Joseph Seward, SEWARD HENDERSON PLLC,
Royal Oak, Michigan, for Appellant.  Christopher P. Desmond, JOHNSON LAW, PLC, Detroit,
Michigan, for Appellee.

_____

### OPINION

_____

        JANE B. STRANCH, Circuit Judge.  In early 2020, Ryohei Akima was arrested for
operating a vehicle while intoxicated based on his performance on a three-part field sobriety
exam and a preliminary breathalyzer test.  Arresting Officer Caitlyn Peca determined that he
failed the assessments across the board, but that proved to be incorrect.  The Officer had both
administered the field sobriety tests improperly and misread the breathalyzer by a factor of ten.

Although Akima blew a blood alcohol content of 0.02, well below the legal limit of 0.08, Peca read the result as 0.22 and arrested him, causing Akima, a Japanese citizen, to lose his work visa and to be deported. When a blood test confirmed the Officer's error, Akima sued, alleging constitutional violations and common law torts. Officer Peca moved to dismiss, and later for summary judgment, based on qualified immunity. The district court permitted Akima's constitutional claims to proceed, concluding that a reasonable jury could determine the Officer lacked probable cause and was not entitled to qualified immunity. We **AFFIRM**.

## I. BACKGROUND

### A. Factual Background

On the night of February 19, 2020, Officer Peca arrested Ryohei Akima in Fowlerville, Michigan. At the time, Akima was in the United States on a valid work visa as an employee of a Michigan-based technology company. Officer Peca was in her first six months as a member of the Fowlerville Police Department.[1]

The Officer pulled Akima over for driving with an inoperative headlight, and after effecting the stop, approached his vehicle from the driver's side. Akima greeted her with his window down, and she explained that she was stopping him because of a broken headlight. In an accented voice, Akima replied, "What?" The question prompted Officer Peca to reiterate her explanation, this time speaking more slowly and gesturing to the front of the car. Akima then opened his door and exited the vehicle to inspect the issue she had flagged. Seeing the defunct headlight, Akima expressed comprehension, exclaiming "oh, okay," before returning to the driver's seat. As he reentered the vehicle, Akima spoke briefly in a foreign language, apparently explaining the situation to a colleague in the passenger's seat.

---

[1]This case comes to us on an appeal from denials of a motion to dismiss and a motion for summary judgment, so this overview draws, at times, from both the complaint and the evidence adduced in discovery. Primarily, though, it relies on a dashcam recording, which was available on both motions. And the parties agree discovery did little to change the underlying factual posture. The factual background is, therefore, presented in a single, streamlined account.

Officer Peca requested Akima's license and registration, continuing in the same methodical tone and using her hands to punctuate her orders. After a little over a minute, Akima produced a handful of documents and stated simply, "international driver's license."

As Akima handed Officer Peca his materials, she asked if he had been drinking. He acknowledged he had been. When Officer Peca asked how much, Akima said, "just a little bit out of the bottle." The Officer ended the inquiry there, directing Akima to look for his insurance and registration while she returned to her vehicle with his paperwork.

Officer Peca began processing the stop by radioing a colleague, Deputy Sheriff Adam Jaime, for advice. She said that Akima could "barely speak English" and was "not going to understand anything"; had given her his Japanese passport and U.S. visa; and had apparently been drinking. She expressed frustration at the situation throughout the call, repeatedly stating, "I don't know," "I don't know." Ultimately, Officer Peca explained that Akima smelled like vodka, had eyes consistent with alcohol consumption, had been drinking, quote, "from the bottle," and had acted erratically during their interaction. The consultation concluded with the officers agreeing that she should run field sobriety tests.

Officer Peca put Akima through a three-part evaluation, starting with an eye exam known as a "horizontal gaze nystagmus" test, a process that "involves moving a stimulus from side to side while the subject follows it with" their eyes. *Green v. Throckmorton*, 681 F.3d 853, 857 (6th Cir. 2012). The administrator watches for "involuntary jerking of the eye," a reflex that becomes more pronounced with intoxication. *See id.* Officer Peca testified in her deposition that Akima's performance on this exam was "consistent with an individual being under the influence of alcohol or drugs," though the video is not clear enough to confirm this result. Deputy Jaime reviewed the video and later testified that Officer Peca ran the exam improperly.

Next, Officer Peca conducted a walk-and-turn test, instructing Akima to take nine steps heel-to-toe in one direction before turning and retracing his steps. The video shows Akima swaying moderately as he prepares to start the task, holding both arms out for balance as he walks, and tilting sideways unevenly when he makes the turn. Deputy Jaime testified that each of these behaviors indicated intoxication, and Officer Peca testified that Akima failed the exam.

Deputy Jaime also testified that Peca should have asked Akima if he had any medical conditions or disabilities that might affect his performance on the drill, and that language barriers could affect the outcome of the test.

Last, Officer Peca administered a one-legged-stand test, instructing Akima to stand on one foot while holding his other foot six inches above the ground. Akima held the position with relative stability, though with some wobbling, for around twenty-five seconds before teetering sideways in a near fall. Officer Peca testified that Akima's performance was "consistent with him not completing that task." Deputy Jaime agreed, but also acknowledged that a subject's medical conditions, disabilities, and communication difficulties may affect the results of the one-legged-stand test, just as they may interfere with the walk-and-turn test.

Determining that Akima's performance on these three initial tests suggested intoxication, Peca conducted a preliminary breathalyzer test. She instructed Akima to blow into the breathalyzer, which required four attempts before Akima registered a reading. Officer Peca interpreted the test as showing an alcohol content of 0.22, well above Michigan's legal limit of 0.08. In reality, however, the breathalyzer had reported 0.02, well under the legal limit. Upon making the mistaken reading, the Officer placed Akima under arrest for operating while intoxicated and detained him in the back of her police unit.[2]

Officer Peca then took her place in the front of her vehicle to process the arrest, and Deputy Jaime soon joined her. After several minutes of reviewing Akima's information, the officers reengaged with him, asking how long he would be in the country and whether he had any form of U.S. identification. Akima explained the details of his visa, that he had an international, not a U.S., driver's license, and that the license should be in his vehicle but that he had not had time to locate it at the beginning of the encounter. Akima then sought permission to retrieve his international license from his car, but the officers said it was now "irrelevant." It is undisputed that Akima's international license was, in fact, in his vehicle during the arrest.

---

[2]The amended complaint alleges that the breathalyzer registered a 0.022; the evidence at summary judgment suggests the result came in at 0.02. The difference is immaterial in this case, so although we consider the 0.022 figure in reviewing the motion to dismiss and the 0.02 figure in reviewing the motion for summary judgment, we refer only to the 0.02 figure for the remainder of this opinion to avoid confusion.

Officer Peca spent the next half-hour on paperwork, requesting a warrant to draw Akima's blood. During that time, she made several comments about her ability to complete the arrest. At the beginning, she chastised herself for being "so unprepared." Later, she told a colleague over the radio, "I have no idea what I'm doing." At the end, she thanked the same colleague for his help, reiterating, "I literally had no idea what I was doing."

Officer Peca eventually completed the paperwork, obtained a search warrant, and transported Akima to the hospital for a blood draw before booking him at the county jail. The blood draw took place around an hour-and-a-half after the initial stop. When the results came back a week later, they revealed a blood alcohol content of 0.014, which, like Akima's breathalyzer score, falls well below Michigan's legal limit. Soon after, the charges against Akima for operating while intoxicated were dismissed.

**B. Procedural Background**

Akima sued Officer Peca for false arrest, false imprisonment, and intentional infliction of emotional distress in the U.S. District Court for the Eastern District of Michigan. He alleged that, as a result of the arrest and notwithstanding the ultimate dismissal of charges against him, his U.S. visa was revoked and he was deported to Japan. According to the complaint, Akima was required to complete substance abuse courses in Japan before he could renew his visa, and the process interrupted his ability to work in the United States for several months.

Seeking compensation for this ordeal, Akima filed a complaint on January 11, 2021. Officer Peca moved for judgment on the pleadings the next month, asserting qualified immunity, and then moved to stay discovery pending the resolution of her motion. The district court granted the stay motion, citing Peca's qualified immunity defense, but denied without prejudice the motion for judgment on the pleadings, permitting Akima to amend his complaint.

Akima filed an amended complaint in September 2021. The district court then sua sponte lifted the stay, explaining that it had reviewed the amended complaint and determined it contained "facts that likely would allow the case to go forward even if a renewed pleading challenge under Federal Rule of Civil Procedure 12 [were] presented." Despite this order, Officer Peca filed a motion to dismiss the next week, accompanied by a second stay motion. The

district court denied the stay motion, reiterating that "the amended complaint alleges facts that likely will defeat the assertion of the qualified immunity defense at the pleading stage," undermining any "good reason" to further delay discovery.

Officer Peca appealed, urging reversal of the decision to permit discovery during the pendency of her motion to dismiss. In a split decision, we declined to intervene, preserving the status quo in the district court where discovery continued and Officer Peca eventually moved for summary judgment with her motion to dismiss still outstanding. The district court issued a single opinion ruling on both motions, denying Officer Peca's motion to dismiss in full and granting in part and denying in part her motion for summary judgment. The court permitted Akima's constitutional claims for false arrest and false imprisonment to proceed, but dismissed the state law claim for intentional infliction of emotional distress. Officer Peca timely noted this appeal.

## II.  ANALYSIS

### A.  Standard of Review

Officer Peca appeals the district court's denial of both motions. Although orders denying such motions are generally not final decisions reviewable under 28 U.S.C. § 1291, we recognize an exception for orders denying qualified immunity to the extent the outcome "turns on an issue of law." *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). At both stages of litigation, we review de novo a district court's denial of qualified immunity. *Hart v. Hillsdale County*, 973 F.3d 627, 634 (6th Cir. 2020) (motion to dismiss); *Raimey v. City of Niles*, 77 F.4th 441, 446-47 (6th Cir. 2023) (motion for summary judgment).

On a motion to dismiss, we accept the plaintiff's factual allegations as true and draw all reasonable inferences in his favor. *See Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016). We ask only whether, "reading the complaint in the light most favorable to the plaintiff, it is plausible that an official's acts violated the plaintiff's clearly established constitutional right." *Id.* (quoting *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 562-63 (6th Cir. 2011)). At this stage, "it is generally inappropriate" to "dismiss on the basis of qualified immunity." *Hart*, 973 F.3d at 635 (quoting *Wesley v. Campbell*, 779 F.3d 421, 433

(6th Cir. 2015)).  Whether an officer is entitled "to qualified immunity is a threshold question to be resolved at the earliest possible point," but "that point is usually summary judgment and not dismissal under Rule 12." *Id.* (quoting *Wesley*, 779 F.3d at 433-34).

On a motion for summary judgment, the movant can succeed only where there is no "genuine dispute" of "any material fact." Fed. R. Civ. P. 56(a).  We "view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in his favor." *Raimey*, 77 F.4th at 447.  Consistent with the extent of our jurisdiction, a defendant appealing a denial of qualified immunity at the summary judgment stage must generally "concede the most favorable view of the facts to the plaintiff." *Adams v. Blount County*, 946 F.3d 940, 948 (6th Cir. 2020) (quoting *Barry v. O'Grady*, 895 F.3d 440, 443 (6th Cir. 2018)).

Where, as here, the record contains "a videotape capturing the events in question," we must adopt a version of the facts that a reasonable jury could accept consistent with the video evidence. *Scott v. Harris*, 550 U.S. 372, 378-80 (2007).  Still, at the motion to dismiss stage we "rely on the videos over the complaint" only "to the degree the videos are clear and 'blatantly contradict' or 'utterly discredit' the plaintiff's version of events." *Bell v. City of Southfield*, 37 F.4th 362, 364 (6th Cir. 2022) (brackets omitted) (quoting *Scott*, 550 U.S. at 380).  And at summary judgment, we continue to construe factual disputes left by "gaps or uncertainties" in the videos in the light most favorable to the plaintiff, ensuring that any reasonable inference breaks his way. *LaPlante v. City of Battle Creek*, 30 F.4th 572, 578 (6th Cir. 2022) (quoting *Latits v. Phillips*, 878 F.3d 541, 544 (6th Cir. 2017)).

## B. Qualified Immunity

Qualified immunity shields government officials from suit where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  An official's qualified immunity defense is analyzed under a two-prong framework, asking whether the official violated a constitutional right, and, if so, whether the right was "clearly established at the time." *D.C. v. Wesby*, 583 U.S. 48, 62-63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  We may exercise our "sound discretion in deciding which of the two prongs of the qualified

immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

For the constitutional violation prong, we determine whether the plaintiff has established a constitutional deprivation—here, regarding false arrest and false imprisonment in violation of the Fourth Amendment. An officer commits these constitutional violations when the officer effects a warrantless arrest without probable cause. *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 279 (6th Cir. 2020). Probable cause exists if a person of "reasonable caution," considering "the facts and circumstances within" the officer's knowledge, would "believe that an offense had been, was being, or was about to be committed." *Hartman v. Thompson*, 931 F.3d 471, 481 (6th Cir. 2019) (quoting *Fox v. DeSoto*, 489 F.3d 227, 236 (6th. Cir. 2007)). We "consider the totality of the circumstances" in determining whether an officer had probable cause, looking to both "the evidence of guilt" and the "exculpatory evidence" available to the officer at the time. *Ouza*, 969 F.3d at 279. This evidence is viewed under an objective standard without considering "the arresting officer's actual motives." *Kinlin v. Kline*, 749 F.3d 573, 579-80 (6th Cir. 2014) (quoting *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988)). "In our circuit, if 'there is some evidence—more than a mere scintilla of evidence—that'" the plaintiff's "conduct, judged from the perspective of reasonable officers on the scene, did not give the officers probable cause, a genuine fact dispute is created." *Harris v. City of Saginaw*, 62 F.4th 1028, 1037 (6th Cir. 2023) (ellipses omitted) (quoting *Chappell v. City of Cleveland*, 585 F.3d 901, 909 (6th Cir. 2009)).

For the clearly established prong, we ask if the officer violated clearly established law, whether, at the time of their conduct, "the law was 'sufficiently clear' that every 'reasonable official would'" have understood they were violating a constitutional or statutory right. *Wesby*, 583 U.S. at 63 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). A rule emerges as "sufficiently clear" when "controlling authority" or a "robust 'consensus of cases of persuasive authority'" dictates the outcome of a case. *Id.* (quoting *al-Kidd*, 563 U.S. at 741-42). Precedent need not be "directly on point," but there must be prior cases involving sufficiently similar circumstances to put the legal question "beyond debate." *Id.* at 64 (quoting *al-Kidd*, 563 U.S. at 741). The specificity of these circumstances is particularly important in Fourth Amendment

cases, where the outcome "turns on the assessment of probabilities in particular factual contexts" that cannot be "reduced to a neat set of legal rules." *Id.* (brackets omitted) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). In the end, qualified immunity is a "legal question," but where it "turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *Green v. Throckmorton*, 681 F.3d 853, 864 (6th Cir. 2012) (quoting *McKenna v. Edgell*, 617 F.3d 432, 437 (6th Cir. 2010)).

In this appeal, Officer Peca maintains she did not violate Akima's constitutional rights because she had probable cause to arrest him on two grounds: driving without a license and driving while intoxicated. Alternatively, she contends that, even if she lacked probable cause, the arrest did not violate clearly established law.[3]

### 1. Driving Without a License

The first basis for probable cause Officer Peca offers is Michigan's driving without a license statute. Under Michigan law, a driver's license must be kept in "immediate possession at all times when operating a motor vehicle," and must be displayed "upon demand of any police officer, who shall identify himself or herself as such." Mich. Comp. Laws § 257.311. "A violation of this statute may occur by 1) failing to possess a license while driving a motor vehicle or 2) failing to display the license on demand of any police officer." *People v. Ethington*, No. 211449, 2000 WL 33535503, at *1 (Mich. Ct. App. Jan. 28, 2000) (per curiam) (citing *People v. McMaster*, 398 N.W.2d 469, 473 (Mich. Ct. App. 1986) (per curiam)). An offense takes place only when a driver fails to produce the requested identification within a reasonable time under the circumstances. *See People v. Moore*, 163 N.W.2d 237, 238 (Mich. Ct. App. 1968) (*Moore I*); *People v. Moore*, 195 N.W.2d 789, 790 (Mich. Ct. App. 1972) (per curiam) (*Moore II*).

---

[3]As referenced above, we rely predominantly on video evidence—available at the motion to dismiss and motion for summary judgment stages—and the parties agree that the factual world changed little during discovery. We thus conduct the following analysis in a single stream, noting the rare instance where we consider evidence not available at the motion to dismiss stage, and mindful that "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity." *Hart*, 973 F.3d at 635 (quoting *Wesley*, 779 F.3d at 433).

For over fifty years, a pair of Michigan Court of Appeals decisions have provided an authoritative interpretation of the state's driving without a license law through review of Charlie Moore's convictions under the statute. *Moore I*, 163 N.W.2d at 237-38; *Moore II*, 195 N.W.2d at 789-90. Moore was charged not for driving without a license, but for failing to keep it in his "immediate possession." *Moore I*, 163 N.W.2d at 237-38. At the time of the arrest, officers approached Moore for parking illegally, and when they asked for his license, Moore explained that it was in his glove compartment, which was locked, and that he had misplaced the key. *See id.* at 237-38. So to comply with the officers' request, Moore tore out the bottom of the glove box to retrieve it. *Moore II*, 195 N.W.2d at 789. This caused a delay of up to four minutes, for which Moore was charged with driving without a license. *Id.* at 789-90.

At Moore's first trial, the court instructed the jury that if it found Moore's license had in fact been "locked in the glove compartment," where force would be necessary to produce it, then, "as a matter of law," the license was not in Moore's "immediate possession." *Moore I*, 163 N.W.2d at 238. Following this instruction, the jury returned a conviction. *Id.* at 237. The court of appeals reversed, concluding that the instruction was tantamount to a directed verdict and holding that what "constitutes 'immediate possession' in a given case is a question of fact for the jury." *Id.* at 238.

At his second trial, Moore was again convicted. This time, the trial court had instructed the jury that Moore was required to produce his license "within a 'reasonable' time." *Moore II*, 195 N.W.2d at 790. Moore again appealed, and the court of appeals agreed this was the correct standard, but held that the "two to four minutes" Moore took to retrieve his license from the locked glove compartment was reasonable as a matter of law, rendering the evidence insufficient to sustain Moore's conviction. *Id.*

*Moore I* and *Moore II* establish that, under Michigan law, drivers must be given a reasonable opportunity to produce their identification—even when it takes several minutes to do so—before a violation for driving without a license may attach.

When Officer Peca requested Akima's license and registration, he turned over what proved to be his Japanese passport and U.S. visa in less than two minutes, adding a comment

about an "international driver's license." Upon accepting Akima's documents, Officer Peca immediately switched tack, asking Akima if he had been drinking. The Officer devoted the remainder of the encounter to assessing Akima's sobriety, never asking for the referenced international license or giving any indication that the identification Akima had produced was insufficient. Ultimately, it was Akima himself who, after being arrested for operating while intoxicated, reintroduced the issue of his driver's license by offering to produce it and explaining that he had not had time to locate it at the beginning of the encounter. But the officers declined, telling him it was now "irrelevant." At most, then, Akima was permitted two minutes to turn over his license—even less opportunity than was provided to Charlie Moore.

*Moore I* and *Moore II* have for decades made clear that, under circumstances like these, Officer Peca lacked probable cause to believe Akima's license was not in his immediate possession. The district court properly denied Officer Peca's motion to dismiss and motion for summary judgment on this ground.

2. Operating While Intoxicated

As an alternative basis for probable cause, Officer Peca invokes Michigan's "operating while intoxicated" law, the anchor of the state's statutory scheme restricting drinking and driving, which proceeds in three parts. Part one prohibits "operating while intoxicated," defined as driving (1) "under the influence of" an "intoxicating substance," or (2) with a bodily "alcohol content of 0.08" or more. Mich. Comp. Laws § 257.625(1). Part two, a complementary regulation, bars driving while "visibly impaired," that is, with less apparent ability than "an ordinary, careful and prudent driver." *People v. Lambert*, 235 N.W.2d 338, 342 (Mich. 1975); Mich. Comp. Laws § 257.625(3). And part three, a zero-tolerance law, prohibits underage drivers from taking the wheel with "any bodily alcohol content," a threshold calibrated at an "alcohol content of 0.02 grams or more." Mich. Comp. Laws § 257.625(6)(a). Officer Peca contends she had probable cause to arrest Akima under the first provision: for "operating while intoxicated."[4]

---

[4]Officer Peca does not claim immunity on the theory that she had probable cause to arrest Akima for driving while "visibly impaired" under § 257.625(3), so we do not consider it.

Our precedent recognizes several factors that inform whether an officer has probable cause to make an arrest for driving while intoxicated. A survey of these cases also confirms the straightforward principle that where the facts underlying a probable cause determination are disputed, and could vitiate not only probable cause but also qualified immunity, we leave them for a jury to resolve. Where the facts are undisputed, judgment may be entered as a matter of law.

We begin with *Miller v. Sanilac County*, 606 F.3d 240 (6th Cir. 2010), which involved the arrest of a minor for purportedly violating Michigan's zero-tolerance law prohibiting underage drivers from driving with "any bodily alcohol content." *See* Mich. Comp. Laws § 257.625(6). After the minor was arrested, a blood test showed his blood-alcohol level was 0.00. *Miller*, 606 F.3d at 246. He sued, and the officer moved for summary judgment, maintaining that the arrest, which was not videotaped, was supported by probable cause notwithstanding the subsequent blood test. As a basis for probable cause, the officer testified that the underage driver had been speeding, carried "a slight odor of alcohol," displayed "glazed or glassy" eyes, had a previous arrest for drunk driving, and failed several field sobriety tests. *Id.* at 245-46. We recognized that the officer's testimony, "if believed, would constitute probable cause to arrest for driving under the influence of alcohol." *Id.* at 249. We nevertheless denied the officer's motion, holding that "in light of the 0.00% blood alcohol result," a reasonable jury could determine the officer "was being untruthful generally about his observations and did not have probable cause to" support the arrest. *Id.* Qualified immunity was denied because whether the officer could reasonably have believed the arrest was lawful turned on the jury's resolution of disputed issues of fact. *See id.* at 248-49.

Applying the same logic, *Green v. Throckmorton*, 681 F.3d 853 (6th Cir. 2012), again preserved the jury's role as factfinder when probable cause turned on disputed facts. *Green* stemmed from an officer's arrest of a driver whose "later blood test for drugs and alcohol came back negative." *Id.* at 862. As in *Miller*, we analyzed the officer's probable cause determination based on the facts available to the officer at the time of the arrest, reiterating that the subsequent negative result "cast doubt on the truthfulness of" the officer's testimony. *Id.* at 863. The officer in *Green* testified that probable cause supported the arrest because the plaintiff (1) could not

follow his pen when he administered a horizontal-gaze nystagmus test; (2) "performed well" when the officer asked her to recite the alphabet from "L" to "S," but "hesitated twice" when he asked her "to count backward from 57 to 42"; and (3) "had difficulty maintaining her balance throughout the one-leg-stand and walk-and-turn tests." *Id.* at 858, 865. We determined that the probable cause and qualified immunity inquiries turned on which "version of the facts" the factfinder accepted, given that the video evidence was too "ambiguous" to corroborate the officer's testimony and that the jury could reasonably opt not to credit his account. *Id.* at 864-66. Accordingly, whether the officer had probable cause presented a jury question, as did the officer's qualified immunity defense. *See id.* at 866.

If *Miller* and *Green* illustrate when the probable cause inquiry must be left to the jury, *Kinlin v. Kline*, 749 F.3d 573 (6th Cir. 2014), highlights the other side of the coin by explaining when probable cause may be determined as a matter of law. Like *Miller* and *Green*, *Kinlin* involved a drunk driving arrest followed by a blood test "well below" the legal limit, this time 0.012. *See Kinlin*, 749 F.3d at 575. Once again, we looked to the facts at the time of the arrest, which was "captured on a video recording." *Id.* at 574. Consistent with the recording, the officer testified that the arrest was justified because the plaintiff "(1) made a lane change with only two feet of clearance, (2) smelled of alcohol, (3) admitted to consuming alcohol, and (4) thrice refused" to perform "a field sobriety test." *Id.* at 579-80. These four facts were undisputed. *Id.* at 580. Accepting the factual agreement, we concluded as a matter of law that the arrest was supported by probable cause notwithstanding the result of the blood-alcohol test, which could "not vitiate the probable cause established by what the officer observed and the results of the field sobriety tests." *Id.* at 581 (quoting *Miller*, 606 F.3d at 248).

Under these cases, Officer Peca contends that four facts provide probable cause for Akima's arrest: Akima (1) "jump[ed] out of the car" to check his headlights at the beginning of the encounter; (2) admitted "he had been drinking"; (3) "had issues with his balance" during

field sobriety tests; and (4) produced what she wrongly but, she maintains, reasonably, believed was a blood-alcohol result of 0.22 on the breathalyzer test.[5]

The first indicator of probable cause Officer Peca offers is Akima's emergence from his vehicle at the outset of the encounter, a fact that is confirmed by the video and undisputed. Peca suggests that this behavior was erratic and that it signaled possible intoxication. Akima's exit from the car may reasonably have surprised the Officer, but it is hardly a hallmark of inebriation, particularly when coupled with Akima's measured gait as he circled the vehicle for the purpose of checking his headlight and the cultural disconnect Officer Peca recognized was at play. So though this conduct, if corroborated by other inculpatory evidence, might play a role in determining probable cause in some situations, its value on this record is marginal.

The same is true of Akima's statement that he had been drinking "just a little bit out of the bottle." A driver's disclosure of drinking may, along with other inculpatory factors, support probable cause, *see Kline*, 749 F.3d 580-81, and the video evidence and transcript corroborate the fact of Akima's statement. Drinking "a little bit," however, is not drinking to excess. To the contrary, here it is consistent with Akima's breathalyzer result that established his alcohol consumption was minimal. In context, Akima's statement does little to propel us toward finding probable cause.

The most potentially inculpatory fact Officer Peca raises is Akima's performance on the field sobriety tests. As Deputy Jaime described it, Akima completed the walk-and-turn test as if "on a tightrope," arms extended to each side for stability. In attempting to maintain his balance, Deputy Jaime observed, Akima raised his hands "over six inches," which Deputy Jaime considered a "clue" suggesting intoxication. Then, on the one-legged-stand test, Akima teetered over, nearly falling to the ground. According to the Deputy, this was "another clue."

Deputy Jaime also testified, however, that Officer Peca administered the tests incorrectly, and, critically, in ways that may have affected the outcome. The credibility of the results was also undermined by Officer Peca's remarks throughout the course of the arrest acknowledging

---

[5]Officer Peca does not rely on Akima's scent of alcohol, or uncorroborated performance on the eye test, which, we have held, present jury questions when the officer's credibility is at issue. *See Green*, 681 F.3d at 862-63.

she had "no idea" what she was doing. And Officer Peca's failure to correctly conduct the breathalyzer could reasonably shake a jury's confidence in her ability to perform the other assessments. Given these serious problems with the integrity of the evaluation, a jury could reasonably opt to give little weight to its results.[6]

Finally, the breathalyzer. The parties agree that Akima blew a 0.02, but that Officer Peca misinterpreted the result as 0.22. In determining probable cause, only the accurate result—the result a reasonable officer would have observed—matters: Officer Peca's subjective view is "irrelevant." *See Kline*, 749 F.3d at 579-80 (quoting *Criss*, 867 F.2d at 262). Akima's true alcohol content, 0.02, is well below Michigan's threshold of 0.08 for "operating while intoxicated." Mich. Comp. Laws § 257.625(1). Indeed, 0.02 is a familiar benchmark because it is the precise alcohol content required to trigger the state's zero-tolerance law banning minors from driving with "*any* bodily alcohol content." *Id.* § 257.625(6) (emphasis added). Michigan's levelling of the zero-tolerance law at 0.02, combined with the already significant gulf between 0.02 and 0.08, gives Akima's breathalyzer result substantial exculpatory value.

Officer Peca does not dispute that properly reading the breathalyzer would have helped clear Akima of an operating while intoxicated charge under these circumstances, but still maintains that her misreading was a reasonable one. An arrest based on a reasonable mistake of fact does not violate the Fourth Amendment. *Heien v. North Carolina*, 574 U.S. 54, 61 (2014). But the Supreme Court has emphasized that such "mistakes must be those of reasonable" officers. *Id.* (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)); *see also id.* at 68-71 (Kagan, J., concurring). For example, "if officers with probable cause to arrest a suspect mistakenly arrest an individual matching the suspect's description," the arrest remains reasonable notwithstanding the mistake of fact. *Id.* at 61. Likewise, the "warrantless search of a home" predicated on "the consent of a resident . . . remains lawful when officers obtain the consent of someone who reasonably appears to be but is not in fact a resident." *Id.* The touchstone is

---

[6]We do not rely on Deputy Jaime's deposition testimony in considering the motion to dismiss. But the video of Akima's performance is "sufficiently ambiguous," *Green*, 681 F.3d at 865, that it does not "blatantly contradict[]," *Scott*, 550 U.S. at 380, the amended complaint's allegation that Akima "accomplished the task." When taken alongside the other video evidence "call[ing] into question the credibility of" Officer Peca, review of the video at the motion to dismiss stage leads to the same conclusion as at summary judgment: "reasonable jurors could interpret the video evidence," and the weight it deserves, "differently." *See Green* 681 F.3d at 862, 865.

always reasonableness. *Id.* at 60. A breathalyzer, however, invites none of the hazy judgment calls involved in matching a suspect to a description or a resident to an apartment. It yields a single, objective reading that every reasonable officer should be able to ascertain. A jury could properly conclude that Officer Peca's failure to do so was unreasonable.

To complete the universe of facts, we must also account for the "exculpatory evidence" a reasonable officer would have discerned. *Ouza*, 969 F.3d at 279. In this case, the video shows that throughout most of the encounter Akima appeared "completely lucid and rational." *Green*, 681 F.3d at 864. There is no evidence that Akima drove erratically, slurred his speech, or appeared out of control. A reasonable officer would have considered the significance of these exculpatory factors in addition to the evidence Officer Peca focuses on.

Putting all this together, a reasonable jury could find the facts as follows. While driving without any apparent difficulty, Akima was stopped for a broken headlight. Early on in the stop, perhaps due to evident communication barriers, Akima took the atypical step of exiting his vehicle. Thereafter, Akima acknowledged he had been drinking "just a little bit," registered 0.02 on a breathalyzer, exhibited a temperate and responsive demeanor, and maintained a steady speech and gait. He also completed three field sobriety tests, which a jury could determine he performed adequately, or which it could choose to assign little weight given Officer Peca's errors in administering them.

On this set of findings, it would be evident to a reasonable officer that Akima was, quite apparently, sober. So a reasonable jury could conclude that Akima's arrest was not supported by probable cause and that Officer Peca was not entitled to qualified immunity. On this record, the district court properly denied Officer Peca's motion to dismiss and motion for summary judgment.

## III. CONCLUSION

For the reasons set forth above, we **AFFIRM** the judgment of the district court.