NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0085n.06

Case No. 25-1366

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Feb 12, 2026
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| DAKARAI LARRIETT, | ) | |
| Plaintiff - Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| | ) | |
| MICHIGAN DEPARTMENT OF STATE POLICE; GEORGE MICHAEL KANYUH; MATTHEW OKAIYE, | ) | |
| | ) | OPINION |
| Defendants - Appellees. | ) | |
| | ) | |

Before: DAVIS, RITZ, and HERMANDORFER, Circuit Judges.

**RITZ, Circuit Judge.** Michigan State Troopers George Kanyuh and Matthew Okaiye pulled over Dakarai Larriett late at night after Larriett rolled through a redlight. After conducting a series of sobriety tests, Kanyuh and Okaiye arrested Larriett for driving under the influence, subjected him to additional tests, and held him at the county jail even after he passed a blood test.

Larriett, a gay Black man who was driving with another Black man during the incident, claimed the officers discriminated against him based on his race and sexual orientation. He brought claims against Kanyuh, Okaiye, and the Michigan Department of State Police for Fourth and Fourteenth Amendment violations, malicious prosecution, false arrest, and intentional infliction of emotional distress. The district court dismissed the case, and we affirm.

**BACKGROUND**

## I.       Initial traffic stop

On April 10, 2024, Larriett was driving his Cadillac SUV in Benton Harbor, Michigan at 3:09 a.m. when he rolled through a redlight. Larriett insists he made a full and complete stop, but police dash camera footage shows that he failed to fully stop before turning. Kanyuh and Okaiye pulled Larriett over. As they did, and as Larriett turned onto a side street, Kanyuh read Larriett's license plate aloud—"DAKARAI"—as the alcoholic drink "daiquiri," and Okaiye responded "[they were] going places." RE 20-1, Dash Camera Footage, at 00:56-00:57.

Kanyuh approached the driver's side window of Larriett's car, asked Larriett for his license, and informed him that he pulled him over for failing to stop at two redlights.[1] After reviewing Larriett's driver's license, Kanyuh asked for his registration and insurance. As Larriett searched for these documents, Kanyuh commented that Larriett had a "nice car" and asked "how's it driving?" RE 20-2, Kanyuh Body Camera Footage, at 02:00-02:01. Kanyuh, while reviewing Larriett's insurance, asked Larriett how long he had owned the car, to which Larriett replied "three years." *Id.* at 02:16-02:18.

After Larriett provided his registration, Kanyuh concluded that it was expired and asked for an updated copy. Larriett did not have one, but assured Kanyuh that it was updated, and Kanyuh responded that he would "verify all of that." *Id.* at 02:24-03:51. Kanyuh then asked Larriett if alcohol had impacted his ability to drive; Larriett answered in the negative. When Kanyuh asked when Larriett last drank and Larriett did not immediately respond, Kanyuh asked if it "had been at least two hours." *Id.* at 03:54-03:58. Larriett quickly responded "yes." *Id.* at 03:59.

---

[1] The dash camera footage only shows Larriett rolling through one redlight. Larriett alleged that he did not commit any traffic violations. For our purposes, we accept that Larriett rolled through one redlight, as captured on camera.

After Kanyuh asked Larriett what he drank, Larriett hesitated, and Kanyuh commented that he was "smelling [something] fruity and a little bit of something else on you." *Id.* at 04:03-04:08. Larriett then denied that he had consumed any alcohol at all. Kanyuh insisted that he could "smell it on [his] breath . . . something fruity," and asked to confirm that "it's been at least two hours" from when Larriett last drank alcohol. *Id.* at 04:11-04:19. In response, Larriett continued to say "there is no alcohol," which prompted Kanyuh to ask Larriett to get out of his car so that Kanyuh could "verify." *Id.* at 04:11-04:19.

As Kanyuh spoke to Larriett, Okaiye talked to the passenger of the car, Larriett's friend Tae. Okaiye asked Tae his name and age, how he knew Larriett, and where they had been.[2]

## II.     Field sobriety tests

Kanyuh then conducted a series of field-sobriety tests. Before administering the tests, Kanyuh asked Larriett if he took any medications, and if so, which ones. Larriett confirmed that he did take medication but declined to answer which ones, saying he "prefer[red] to keep [his] medication private." *Id.* at 05:16-05:22.

In one test, Kanyuh instructed Larriett to follow the tip of Kanyuh's finger with only his eyes. Larriett blinked rapidly throughout the test. Kanyuh asked if Larriett was wearing contacts and if he needed to "rub [his] eyes or something" because he was "just not tracking it." *Id.* at 05:45-06:12. Larriett confirmed that he had been wearing contacts for roughly an hour but his

---

[2] Okaiye's body camera captured some of this conversation, but portions of the audio are omitted. For instance, when Okaiye asks Tae for his age, the audio cuts out for a few seconds. Other gaps in the audio are longer. During one such gap, Larriett alleges Kanyuh had Okaiye "ask [Tae] if that was really [Larriett's] car," and Tae responded "[y]eah, why wouldn't it be?" RE 1-1, First Larriett Aff., PageID 12. This conversation led Tae to conclude that the officers "didn't think Black people drive in style" and they "really thought it wasn't [Larriett's]." *Id.*; *see also* RE 32-2, Second Larriett Aff., PageID 149. We accept Larriett's account of this conversation as true.

eyes were not dry. Kanyuh's body camera showed that during at least one part of the test, Larriett stopped looking at Kanyuh's finger.

In another test, Kanyuh asked Larriett to recite part of the alphabet. Before starting, Kanyuh asked Larriett what his highest level of education was. After Larriett replied "masters," Kanyuh said "I could tell with the Cadillac," and then asked "so you know your alphabet?" *Id.* at 10:22-10:27. During a separate test, Kanyuh asked Larriett to count down from 99 to 81. Larriett started at 99 and stopped at 89.

After the tests, Kanyuh asked Larriett "on a scale of zero to five, as far as five being unsafe to operate a motor vehicle, the most drunk and high you've ever been, and then zero being sober, where are you at right now?" *Id.* at 14:54-15:04. Larriett refused to answer, saying "is that really relevant, I really don't want to talk about that." *Id.* at 15:04-15:08. Kanyuh said "it is relevant, but if you don't want to answer it, I don't care." *Id.* at 15:08-15:10. Larriett again insisted that he had not consumed any alcohol. Kanyuh replied "how about marijuana because you have had that." *Id.* at 15:17-15:21. Larriett said that he had not used marijuana.

Kanyuh then returned to the police car and searched through the trunk, apparently looking for something. Okaiye asked Kanyuh "straws?"[3] Kanyuh replied that he did not have any with him but that he thought they "had a stash in here somewhere," in apparent reference to breathalyzer test strips. *Id.* at 17:21-17:31; RE 36-2, Okaiye Body Camera Footage, at 17:16-17:26. Regardless, Kanyuh said, "[Larriett was] going to refuse anyway." RE 20-2, Kanyuh Body Camera Footage, at 17:31-17:34; RE 36-2, Okaiye Body Camera Footage, at 17:27-17:28. Okaiye asked for Kanyuh's assessment of Larriett's ability to drive. Kanyuh replied that he did not "know

---

[3] Larriett alleges the officers said "[d]rugs," not "straws," and that they planned "to plant drugs in [his] vehicle and implicate him in a drug crime." RE 1, Compl., PageID 4. But Kanyuh and Okaiye's body camera footage plainly contradicts this allegation.

what he's on" but he "assum[ed] weed and alcohol." RE 20-2, Kanyuh Body Camera Footage, at 17:37-17:42.

Okaiye then spoke to Larriett alone, asking to "take a look at [him]." RE 36-2, Okaiye Body Camera Footage, at 17:47-17:51. Larriett asked Okaiye to explain why he had been stopped and that the stop was "very excessive." *Id.* at 18:23-18:26. Okaiye explained they did not make the tests but "it's just what [they] have to do" and it was a "national test." *Id.* at 19:14-19:16, 23:02-23:04. He explained the test was not a pass or fail but was intended to evaluate the driver's ability to safely operate a vehicle.

Okaiye asked if he could examine Larriett's pupils. Larriett agreed, and during the examination, Okaiye asked him a number of personal questions, such as if he lived alone and where, what he did for work, and how long he worked for his employer. He also asked Larriett if he had alcohol that day, which Larriett again denied.

## III. Arrest

After speaking with Larriett, Okaiye returned to the police car and conferred with Kanyuh. Kanyuh reported that Larriett wobbled when he was asked to stand on one leg; swayed during the heel-toe test; failed to count down to 81; did not smoothly track Kanyuh's finger with his eyes; blinked rapidly and showed divided attention; and failed to stop at redlights. Okaiye asked Kanyuh if he believed it was "just marijuana," and Kanyuh replied that he believed Larriett had "a medication he's not telling [them] about." RE 20-2, Kanyuh Body Camera Footage, at 25:14-25:18. Okaiye agreed, suspecting that Larriett's use of a prescription medication in combination with another substance, such as THC or alcohol, caused him to be impaired.

The officers returned to Larriett, who was leaning against the officers' vehicle. Kanyuh explained to Larriett that he initially pulled him over for failing to stop at two red stoplights.

Kanyuh said he then smelled alcohol in the car, either from Larriett or Tae, and that Larriett gave inconsistent answers when asked if he had been drinking: first saying it had been at least two hours, then insisting he never drank. Larriett again disputed that he failed to stop at the traffic lights or had been drinking and objected to Kanyuh's questioning of his drinking as leading. But Kanyuh said that his sobriety evaluations led him to determine that Larriett was "under the influence and driving." *Id.* at 27:34-27:37. He informed Larriett that he would need to be brought in for a blood test and stay for a "detox window." *Id.* at 27:38-27:41.

Larriett again disputed that he made any moving violations or was under the influence of drugs or alcohol. When Larriett asked what tests he failed, Kanyuh, like Okaiye, responded that the tests were not pass or fail but that he noticed "several signs of divided attention, not being able to focus on the instructions as [he had] given them . . . and fine motor skills being impaired, such as not being able to touch the heel to toe, the rigid body movements," and swaying. *Id.* at 28:09-28:36. Larriett interjected that he was "very tired," seemingly to explain his performance on the tests. *Id.* at 28:21-28:23.

Kanyuh told Larriett that if his drug and alcohol tests came back clear, the matter would be let go and he would not "write [him] a bunch of tickets." *Id.* at 28:38-28:45. Okaiye then told Larriett that he was a "smart, intelligent guy" but although he felt as though he could drive his car, his prescription medication could interact with alcohol or marijuana in a way that would impair his ability to drive. *Id.* at 28:56-29:25. After they verified that Larriett was "okay," he would need to "go through . . . a process called detoxification" to "wait until whatever is in [his] body is out of [his] body." *Id.* at 29:30-29:55.

Okaiye offered to give Larriett his and Kanyuh's information, and Larriett asked for their badge numbers, saying he felt he had been "harassed." *Id.* at 30:10-30:39. But Okaiye reiterated

that even if Larriett ultimately was not under the influence, he still needed to go to the hospital and sit through detoxification because they believed he could not safely operate a motor vehicle. Kanyuh also repeated that once he took the test, the six-hour detoxification period would begin.

Okaiye told Larriett that if he did that, he would be "free to go," but that if he did not consent to the test, the officers would obtain a search warrant to draw his blood, and he would receive six points on his driver's license plus a year-long suspension. *Id.* at 31:22-31:45. Kanyuh read Larriett a statement informing him as much, and asked if he understood. When Larriett replied "not 100%," Kanyuh asked him what questions he had, *id.* at 41:11-41:15, and Larriett said he had "never seen anything like that before," *id.* at 41:18. Kanyuh explained that by signing his driver's license, Larriett consented to a blood draw "any time a police officer asks." *Id.* at 41:19-41:29.

Kanyuh asked Larriett if he would take a blood test, and Larriett verbally agreed. The officers put Larriett in the front seat of their car and put him in handcuffs. During the drive to the hospital, the officers asked him personal questions, such as where he was from and what he did for work. Larriett alleged that when he arrived at the hospital, he was "compelled to sign a consent form for the blood test," which he submitted to. RE 1-1, First Larriett Aff., PageID 12. Larriett did not specify the contents of this form, such as whether it explained the consequences of refusing to submit to a blood draw.

The officers then took Larriett to the Berrien County Jail and informed him that he passed the alcohol test. He was booked and took an X-ray that "revealed an anomaly in [his] stomach." *Id.* Kanyuh suggested this anomaly was a bag of drugs, and "pressured [Larriett] to confess to avoid additional charges." *Id.* To confirm Larriett did not ingest drugs, Larriett "was required to use the restroom publicly" and Kanyuh instructed him, "[d]on't flush." *Id.* It is unclear what

additional steps the officers took, but the "anomaly was later determined to be gas bubbles in [Larriett's] stomach." *Id.*

Larriett was released around noon the same day. The next day, April 11, 2024, Larriett went to an urgent care clinic for a drug and alcohol test, which showed that he was negative for all drugs and alcohol.

### IV.     Procedural history

Larriett sued Kanyuh, Okaiye, and the Michigan Department of State Police. He brought Fourth and Fourteenth Amendment claims under 42 U.S.C. §§ 1981 and 1983, plus state-law claims for malicious prosecution, false arrest, and intentional infliction of emotional distress. Defendants moved to dismiss.

After reviewing the dash camera and body camera footage, the district court granted defendants' motion. The court found that Kanyuh and Okaiye had probable cause to stop Larriett for violating a traffic law, had reasonable suspicion to prolong the stop, and had probable cause to arrest him. Because no constitutional violation occurred, the court concluded that the officers were entitled to qualified immunity. The district court also dismissed the Michigan Department of State Police as a defendant, finding it was entitled to sovereign immunity for violations under 42 U.S.C. §§ 1981 and 1983. And the court found those same claims against Kanyuh and Okaiye in their official capacities to be "redundant." RE 41, Op. & Order, PageID 226-27. Finally, the district court declined to exercise supplemental jurisdiction over Larriett's state-law claims because it had dismissed all federal claims.

Larriett timely appealed. We have jurisdiction under 28 U.S.C. § 1291.

**ANALYSIS**

On appeal, Larriett argues the district court erred by crediting dash camera and body camera footage over his allegations; granting qualified immunity at the pleading stage; dismissing his 42 U.S.C. § 1981 claim for failing to allege a comparator; and dismissing his official capacity claims. Larriett's arguments are unavailing.

## I. Materials considered

Before addressing the merits, we delineate the scope of the record.

### A. Affidavit in support of opposition to motion to dismiss

At the motion-to-dismiss stage, we credit all well-pled factual allegations in Larriett's complaint and draw all reasonable inferences in his favor. *See Guertin v. Michigan*, 912 F.3d 907, 916 (6th Cir. 2019). Generally, we are limited to considering the pleadings, attachments to the pleadings, documents that are referred to in the complaint and central to the plaintiff's claim, and matters of public record. *Saalim v. Walmart, Inc.*, 97 F.4th 995, 1002 (6th Cir. 2024). "This rule applies just as much when the plaintiff attaches evidence to its opposition as when (as is more common) the defendant attaches evidence to its motion." *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 483 (6th Cir. 2020). "The court may not take into account additional facts asserted in a memorandum opposing the motion to dismiss, because such memoranda do not constitute pleadings under [Fed. R. Civ. P.] 7(a)." *Id.* (citation modified).

Larriett attached multiple exhibits to his opposition to defendants' motion to dismiss. Some of these exhibits, such as the results of his drug test, were referenced in his complaint. Others, such as a new affidavit alleging additional examples of Kanyuh and Okaiye's conduct to support his claims of racial and sexual-orientation discrimination, constituted new facts unalleged in the complaint. For instance, Larriett alleged in this affidavit that the officers "mock[ed] [his]

African name and ma[de] homophobic comments . . . that [he] smelled 'fruity.'" RE 32-2, Second Larriett Aff., PageID 149. But Larriett cannot "amend [his] complaint in an opposition brief or ask the court to consider new allegations (or evidence) not contained in the complaint." *Bates*, 958 F.3d at 483. Accordingly, to the extent Larriett relies on allegations not pled in his complaint, we do not consider them.

### B. Body camera and dash camera

Larriett's "complaint implicitly relies on the videos by recounting facts that could only be known to him by watching the videos," *Bell v. City of Southfield*, 37 F.4th 362, 364 (6th Cir. 2022), including his allegations that Kanyuh and Okaiye "were planning to plant drugs in [his] vehicle," RE 1, Compl., PageID 3-4. And by citing to the available footage, both parties asked the district court to consider body camera and dash camera footage taken the night of the arrest to resolve defendants' motion, which it did.

"[O]ur use of the videos is limited at this stage." *Bell*, 37 F.4th at 364. "If there is a factual dispute between the parties, we can only rely on the videos over the complaint to the degree the videos are clear and 'blatantly contradict[ ]' or 'utterly discredit[ ]' the plaintiff's version of events." *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). "When facts shown in a video can be interpreted in multiple ways, those facts should be viewed in the light most favorable to the non-moving party." *Lee v. Russ*, 33 F.4th 860, 865 (6th Cir. 2022) (citation modified). And where the video "contains any gaps or uncertainties, we must view those in [plaintiff's] favor as well." *Eastep v. City of Nashville*, 156 F.4th 819, 826 (6th Cir. 2025) (citation modified). But "if the indisputable video evidence contradicts [a plaintiff's] pleadings, his allegations are implausible." *Bell*, 37 F.4th at 364. Here, the video evidence is clear and blatantly contradicts Larriett's key factual allegations.

Larriett argues the police body camera and dash camera footage were "incomplete, redacted, and missing metadata." CA6 R. 15, Appellant Br., at 8. Larriett made similar allegations in his complaint and affidavit supporting his opposition to defendants' motion to dismiss. And he is partially correct: portions of the videos contain redactions to protect personal identifying information, including Larriett's own. But beyond these routine privacy redactions, Larriett does not explain why he believes the videos were "tamper[ed]" with. *Id.* at 6. "[T]here are no gaps in the video[s'] time stamp[s] and no other visible evidence of tampering." *Chappell v. Woods*, No. 19-3355, 2020 WL 6162996, at *2 (6th Cir. June 8, 2020). With the exception of Okaiye's conversation with Tae, we accept the events as depicted in the videos when evaluating Larriett's claims.

## II.     Official capacity claims

We can dispose of Larriett's official-capacity claims quickly. The Eleventh Amendment immunizes states and their departments, including the Michigan Department of State Police, from suit unless the state has waived its immunity, Congress explicitly abrogated Eleventh Amendment immunity by statute, or plaintiff seeks "prospective injunctive and declaratory relief" from a federal court "compelling a state official to comply with federal law." *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507-08 (6th Cir. 2008); *Lavrack v. City of Oak Park*, No. 98-1142, 1999 WL 801562, at *2 (6th Cir. Sep. 28, 1999) ("[The Michigan Department of State Police] is entitled to Eleventh Amendment immunity.").

None of these exceptions apply here. Congress has not abrogated state sovereign immunity from §§ 1981 and 1983 suits. *Freeman v. Michigan Dep't of State*, 808 F.2d 1174, 1179 (6th Cir. 1987) ("[T]he Eleventh Amendment bars a § 1981 action against a state."); *Harrison v. Michigan*, 722 F.3d 768, 771 (6th Cir. 2013) ("It is well established that § 1983 does not abrogate the

Eleventh Amendment."). And "Michigan has not consented to the filing of civil rights suits against it in federal court." *Harrison*, 722 F.3d at 771. Finally, Larriett did not seek injunctive relief below.

On appeal, Larriett argues he "specifically challenged systemic racial and sexual-orientation discrimination by state troopers and the agency's internal culture, which potentially supports a claim for injunctive relief targeting ongoing violations of federal law," and "[a]t a minimum," he "should have been granted leave to amend his complaint to clarify and pursue prospective relief." CA6 R. 15, Appellant Br., at 14-16. But Larriett never requested injunctive relief nor did he move to amend his complaint. We do not "ordinarily address new arguments raised for the first time on appeal." *Michigan Bell Tel. Co. v. Strand*, 305 F.3d 580, 590 (6th Cir. 2002). And because Larriett never sought leave to amend, the district court properly dismissed his official capacity claims with prejudice. *See Spadafore v. Gardner*, 330 F.3d 849, 853 (6th Cir. 2003) (declining to address newly alleged claims where "[n]o motion for leave to amend was ever filed . . . nor was a proposed amendment submitted in any form").

## III.    Section 1983 claims

Next we turn to Larriett's § 1983 claims against Kanyuh and Okaiye in their personal capacities. "To state a claim under [42 U.S.C.] § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Larriett brought two § 1983 claims: (1) deprivation of his Fourth Amendment rights and (2) selective prosecution based on race and sexual orientation in violation of the Equal Protection Clause of the Fourteenth Amendment.

State officials are entitled to qualified immunity from a § 1983 suit unless a plaintiff alleges facts showing (1) the official's "conduct violated a constitutional right" and (2) that right is "clearly established." *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 897 (6th Cir. 2019) (citation omitted). Although "qualified immunity is a threshold question to be resolved at the earliest possible point . . . that point is usually summary judgment." *Wesley v. Campbell*, 779 F.3d 421, 433-34 (6th Cir. 2015) (citation modified). The district court could only grant qualified immunity at the motion-to-dismiss stage "if it is clear that no violation of a clearly established constitutional right could be found under any set of facts that could be proven consistent with the allegations or pleadings." *Jackson v. Schultz*, 429 F.3d 586, 589 (6th Cir. 2005). We review dismissal of a claim "on qualified-immunity grounds de novo." *Mitchell v. City of Benton Harbor*, 137 F.4th 420, 429-30 (6th Cir. 2025).

### A.     Fourth Amendment claims

Larriett argues the officers violated his Fourth Amendment rights by (1) stopping him, (2) extending the stop to conduct sobriety testing, and (3) arresting and detaining him. We address each in turn.

#### 1.     Initial traffic stop

"The temporary stop and detention of a vehicle and its passengers, even for a brief period of time," can violate the Fourth Amendment's protection against unreasonable seizures. *United States v. Copeland*, 321 F.3d 582, 592 (6th Cir. 2003). Generally, this protection is not violated during such stops "where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996).

Here, dash camera footage shows Larriett rolling through the stoplight. Because he violated a Michigan traffic law, Mich. Comp. Laws § 257.612(1)(c), Kanyuh and Okaiye justifiably stopped him.

Larriett argues the district court erred by crediting the video evidence over his allegations and incorrectly dismissed his "affidavit testimony and tampering concerns as 'conclusory,' rather than affording them the benefit of the doubt." CA6 R. 15, Appellant Br., at 6. But Larriett does not explain why the footage is subject to interpretation, beyond insisting that it is. Where the video "blatantly contradict[s] or utterly discredit[s] the plaintiff's version of events," as here, "his allegations are implausible." *Bell*, 37 F.4th at 364 (citation modified). Therefore, Larriett's claim fails.

### 2. Sobriety tests

Next, Larriett argues the traffic stop's extension to conduct field sobriety tests violated his Fourth Amendment rights. We disagree.

Detaining an individual for field sobriety testing "requires specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the continued detention of a motorist after a traffic stop." *United States v. Ellis*, 497 F.3d 606, 612-13 (6th Cir. 2007) (citation modified). We "look at the totality of the circumstances" on a case-by-case basis to determine whether the officer had "a particularized and objective basis for suspecting legal wrongdoing," but also "bear[ ] in mind that officers are permitted to draw on their own experience and specialized training to make inferences from" the available facts. *Green v. Throckmorton*, 681 F.3d 853, 860 (6th Cir. 2012) (citation modified). This test requires us to "determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor

is entirely consistent with innocent behavior when examined separately." *United States v. Perez*, 440 F.3d 363, 371 (6th Cir. 2006) (citation modified).

Here, Kanyuh smelled a "fruity" aroma from Larriett's car; Larriett failed to come to a complete stop at the traffic light late at night; and Larriett seemingly admitted to alcohol consumption before changing his story. RE 20-2, Kanyuh Body Camera Footage, at 03:54-4:09; RE 20-1, Dash Camera Footage, at 00:17-00:25. Larriett's late-night traffic violation is "certainly relevant as part of the totality-of-the-circumstances inquiry," but here is insufficient to "constitute reasonable suspicion of driver impairment" on its own. *Green*, 681 F.3d at 864.

Kanyuh's claim that he smelled a "fruity" aroma from Larriett's car is also relevant but not determinative. RE 20-2, Kanyuh Body Camera Footage, at 04:03-04:08. We have found that an officer's claims of "a slight odor of alcohol coming from [the driver's] breath" and determination that the driver performed poorly on field sobriety tests, "if believed, would constitute probable cause to arrest for driving under the influence." *Miller v. Sanilac Cnty.*, 606 F.3d 240, 245, 248-49 (6th Cir. 2010). But a subsequent 0.00% blood-alcohol-test result "casts doubt on" these claims and may create a question of the officer's credibility that must be resolved by a jury. *Id.* at 248-49.

Similarly, in *Green*, we reviewed a district court's grant of qualified immunity for a police officer who, after a traffic stop, further detained a driver to conduct field sobriety tests after observing her pupils were constricted. *Green*, 681 F.3d at 860-61. Like here, the driver in *Green* took a drug and alcohol test that "later came back negative." *Id.* at 859. Because "the reasonable-suspicion inquiry here turn[ed] on [the officer's] credibility," which was brought into question by the negative drug and alcohol test, we determined the appearance of the driver's pupils was a question for the jury and declined to consider it. *Id.* at 862-63.

Unlike the driver in *Green*, however, Larriett initially told Kanyuh it had been at least two hours since he last had an alcoholic drink, before pivoting to the statement that he had consumed no alcohol at all. *See id.* at 857; *see also Miller*, 606 F.3d at 248. During the stop, Larriett argued that Kanyuh's question was confusing and meant to lead him to admit to drinking. But the video shows that Kanyuh only asked Larriett this question after Larriett did not immediately answer when he last consumed an alcoholic drink. Thus, the totality of the circumstances shows Kanyuh and Okaiye had a particular and objective basis for conducting field sobriety tests.

### 3. Arrest and detention

Finally, Larriett challenges his arrest and detention. An officer violates the Fourth Amendment when he "effects a warrantless arrest without probable cause." *Akima v. Peca*, 85 F.4th 416, 422-23 (6th Cir. 2023). "Probable cause exists if a person of 'reasonable caution,' considering 'the facts and circumstances within' the officer's knowledge, would 'believe that an offense had been, was being, or was about to be committed.'" *Id.* at 423 (quoting *Hartman v. Thompson*, 931 F.3d 471, 481 (6th Cir. 2019)). We "consider the totality of the circumstances," reviewing "both the evidence of guilt and the exculpatory evidence available to the officer at the time . . . under an objective standard without considering the arresting officer's actual motives." *Id.* (citation modified).

Michigan law prohibits "operating while intoxicated," which includes driving "under the influence of alcoholic liquor, a controlled substance, or other intoxicating substance or a combination of" the three. Mich. Comp. Laws § 257.625(1)(a). Here, the officers saw that Larriett wobbled when he was asked to stand on one leg; swayed during the heel-toe test; failed to count down to 81 during the backwards counting test; did not smoothly follow the tip of Kanyuh's finger with his eyes; blinked rapidly; expressed divided attention throughout the tests; smelled of alcohol;

suggested he drank alcohol at least two hours before the stop, only to recant; initially refused to rate his level of intoxication on a scale of zero to five, saying he did not "want to talk about that"; and rolled through a redlight. RE 20-1, Dash Camera Footage, at 00:17-00:25; RE 20-2, Kanyuh Body Camera Footage, at 07:27-07:31, 10:48-11:08, 15:08-15:10, 24:33-25:12, 25:41-25:43. Except for Larriett's performance on the one-leg standing test and heel-toe test and Kanyuh's claims that he smelled of alcohol, the videos confirm each of these observations.

Larriett argues he "passed all sobriety tests, exhibited no indicia of intoxication, and tested negative for drugs and alcohol." CA6 R. 15, Appellant Br., at 10. He also told the officers he was "very tired," insinuating his performance was affected by the late hour. RE 20-2, Kanyuh Body Camera Footage, at 28:21-28:23. As an initial matter, "subsequent evidence that plaintiff had not been drinking does not vitiate the probable cause established by what the officer observed and the results of the field sobriety tests." *Miller*, 606 F.3d at 248 (citation modified). And notwithstanding Larriett's claim that he did not "exhibit[] [any] indicia of intoxication," CA6 R. 15, Appellant Br., at 10, the video footage "blatantly contradict[s]" his "version of events," *Bell*, 37 F.4th at 364 (citation modified). Based on the totality of what they observed, the officers had probable cause to arrest Larriett. *See Kinlin v. Kline*, 749 F.3d 573, 575, 580 (6th Cir. 2014).

Larriett also insinuates his detention at the Berrien County Jail and blood draw were "compelled." CA6 R. 15, Appellant Br., at 1-2. Continued detention without probable cause can be a Fourth Amendment violation. *Jones v. Clark Cnty.*, 959 F.3d 748, 759 (6th Cir. 2020), *abrogated on other grounds by Thompson v. Clark*, 596 U.S. 36 (2022). And drug and alcohol tests are "searches that come within the ambit of the Fourth Amendment." *Relford v. Lexington-Fayette Urb. Cnty. Gov't*, 390 F.3d 452, 457 (6th Cir. 2004) (citation modified). But Michigan is an implied-consent state, which means that the refusal to take a requested sobriety test after being

arrested results in a license suspension and six points to the driver's record. Mich. Comp. Laws §§ 257.625a(6)(b)(v), 257.625c. Moreover, video footage shows Larriett was repeatedly informed that he would be required to spend time in detoxification, even if he agreed to and passed the blood draw. Larriett's arguments are unavailing.

###### B. Fourteenth Amendment claims

Larriett also alleged the officers violated his Fourteenth Amendment rights by selectively prosecuting him on the basis of his race and sexual orientation. To establish a claim for selective prosecution, a plaintiff must show (1) the state actor "single[d] out a person belonging to an identifiable group, such as those of a particular race or religion," (2) the state actor "initiate[d] the prosecution with a discriminatory purpose," and (3) the prosecution had "a discriminatory effect on the *group* which the defendant belongs to." *Stemler v. City of Florence*, 126 F.3d 856, 873 (6th Cir. 1997) (citation modified). "With regard to the first element, it is an absolute requirement that the plaintiff make at least a prima facie showing that similarly situated persons outside [his] category were not prosecuted." *Id.*

Larriett does not allege that "similarly situated persons outside [his] category were not prosecuted," so he fails to state a claim. *Id.*; *see also Daubenmire v. City of Columbus*, 507 F.3d 383, 385, 390 (6th Cir. 2007) (affirming district court's dismissal of selective-prosecution claim where plaintiff "fail[ed] to allege a prima facie case"). He argues that "the Supreme Court held that a complaint alleging discrimination need not contain specific facts establishing a prima facie case." CA6 R. 15, Appellant Br., at 11 (citation modified). But the cases Larriett cites address allegations of employment discrimination, not selective enforcement. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002) ("We hold that an employment discrimination complaint need not include" facts "establishing a prima facie case of discrimination under the framework set forth by

this Court" in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (citation modified)); *Keys v. Humana, Inc.*, 684 F.3d 605, 609 (6th Cir. 2012) (applying *Swierkiewicz*, 534 U.S. at 510-12, 514). Therefore, the district court correctly dismissed this claim.

## IV.    Section 1981 claim

Finally, we address Larriett's claim under 42 U.S.C. § 1981 that the officers intentionally discriminated against him on the basis of race and sexual orientation. Section 1981 guarantees the "the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a). It does not apply to sexual-orientation discrimination. To state a claim for racial discrimination under § 1981, a plaintiff must show "(1) he belongs to an identifiable class of persons who are subject to discrimination based on their race; (2) the defendant intended to discriminate against him on the basis of race; and (3) the defendant's discriminatory conduct abridged a right enumerated in section 1981(a)." *Amini v. Oberlin Coll.*, 440 F.3d 350, 358 (6th Cir. 2006). These requirements "mirror" those of an equal protection claim. *Willie McCormick & Assocs., Inc. v. City of Detroit*, 61 F. App'x 953, 957 (6th Cir. 2003).

Larriett does not plausibly allege the elements of his § 1981 claim. First, he cannot identify how the officers' conduct abridged a right enumerated in § 1981(a). He claimed the officers violated his "right to be free from racial discrimination in the making and enforcement of contracts" and "subject[ed] him to unequal treatment under the law" as "evidenced by their pretextual traffic stop, wrongful arrest, and discussion of fabricating evidence." RE 1, Compl., PageID 6-7. But his allegations do not involve the making and enforcement of contracts. "[S]ome other Courts of Appeals have held that racially motivated arrests and searches made in the absence of probable cause" meet this element "because they fall within the 'equal benefits' and 'like

punishments' clauses of Section 1981(a)." *Cunningham v. Sisk*, 136 F. App'x 771, 775-76 (6th Cir. 2005). But the video evidence here demonstrates that the officers had probable cause to pull Larriett over, reasonable suspicion to prolong the stop, and probable cause to arrest him for driving under the influence. *See id.*

Nor did Larriett plausibly allege that Kanyuh and Okaiye intended to discriminate against him on the basis of race. He argues "the officers treated him in a hostile and intrusive manner, singled him out for unnecessary scrutiny, and subjected him to public humiliation—all while making comments and exhibiting conduct consistent with discriminatory animus." CA6 R. 15, Appellant Br., at 12. But the video evidence again contradicts these claims. For instance, Larriett argues "[h]e was stopped and questioned without probable cause" because of his race. *Id.* Putting aside the fact that the officers had probable cause to pull him over, Larriett did not allege the officers were aware of his race when they stopped him. In fact, the video shows the officers were watching from behind when Larriett rolled through the light, and neither Larriett nor Tae were visible. Thus, we cannot "draw the reasonable inference" that the officers were motivated to stop him because of his race. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Larriett argues the officers "administered sobriety tests he passed, yet claimed he failed." CA6 R. 15, Appellant Br., at 12. This, too, is contradicted by the videos. Kanyuh explained to Larriett that the tests were not pass or fail, but because he noticed indicators of inebriation (as seen in the videos), he believed Larriett was under the influence of drugs or alcohol.

Larriett also says the officers "conducted an invasive search and accused him of swallowing drugs without cause" and he "was told to defecate in public and not flush the toilet during detention." *Id.* It is unclear what "search" he is referring to, but the officers provided a

reason for suspecting he may have swallowed drugs. As Larriett alleged, "an X-ray revealed an anomaly in [his] stomach." RE 1-1, First Larriett Aff., PageID 12.

Because Larriett did not plausibly allege that Kanyuh and Okaiye intended to discriminate against him on the basis of race, we affirm.

## CONCLUSION

For these reasons, we affirm.